ARMIDA E. LOVE, and others *vs.* BARNEY DILLEY, and others. SAME *vs.* SAME. B. R. EDWARDS, and Wife *vs.* SAME.

*Evidence suppressed or destroyed.*

Where it is shown that evidence of the indebtedness of a party to the estate of a decedent, has been suppressed or destroyed by the debtor, or some one acting in his interest, such indebtedness may be established by testimony which, under ordinary circumstances, would be regarded as too vague and indefinite.

APPEALS from the Circuit Court for Allegany County, in Equity.

The case is sufficiently stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., MILLER, RITCHIE, and BRYAN, J.

*J. H. Gordon,* and *William Walsh,* for Mrs. Love and others.

*Benjamin A. Richmond,* for Barney Dilley.

*William M. Price,* for Edwards' heirs.

*A. Hunter Boyd,* for the Everett heirs.

BRYAN, J., delivered the opinion of the Court.

This is the second appeal in this case. The questions now before us relate to the advancements made by Joseph Dilley to Barney Dilley, Mr. and Mrs. Edwards, and Mr. and Mrs. Everett. The deceased in his life-time made large advancements to his children, and carefully preserved the evidences of their several amounts. At the time of his death, most of them were in a trunk which was kept in his bedroom. Some of the most important of the papers, which were kept in this trunk, have disappeared in a manner which has not been satisfactorily explained. Mrs. Margaret Edwards (daughter of the deceased,) testifies that she came to her father's house a few moments after his death; that Barney Dilley and his daughter Edith, (now Mrs. Brace,) the servant Young, and Daniel R. Long were in the house, and that the key was in the trunk, and the trunk was empty. She also says that she made inquiry of Barney Dilley about the books and papers, and that he said that his father never kept any valuable papers about the house. Testimony was given by Mrs. Brace that shortly before his death, her grandfather burnt some of the papers which were in the trunk, and gave her the remainder to put back in it, which she accordingly did; that she next saw the papers three days after his death in the top of the trunk where she had put them; and that in the presence of her father and of Benjamin Edwards, Miss Ida Everett and Miss Hoblitzell, she put them in a satchel and delivered the satchel to her father and Edwards. We will see hereafter how these papers have been accounted for.

A great many exceptions were filed in the Circuit Court to the auditor's reports, and to the evidence. We shall not consider them in detail, but shall examine the conclusions which they are intended to. affect; that is, the amounts of the advancements which are in question before us.

It is shown very clearly that Joseph Dilley gave his children large sums of money and that he kept an account of these sums, with the intention that when his estate was distributed after his death, each of his children should be charged with the amount he had received, so that his property might be equally and impartially divided among them. He usually, perhaps always, took notes from them showing the amounts of his gifts. These notes he preserved carefully up to the time of his death. There is some evidence that he also kept an account or memorandum book showing the amounts given to his children; but the proof on this point is not very distinct. Of course, if his notes and papers could be obtained, there could not be the least difficulty in ascertaining these different amounts, and in making a perfectly fair division of his property among his children. But as in some instances they have disappeared, we are, of necessity, obliged to rely upon the more uncertain and unsatisfactory evidence set forth in the record. It is morally impossible that our conclusions should be accurate. We at best can only hope to make an approximation to true results. But the blame must rest on those who have destroyed or concealed the evidence which would remove all obscurity on the subject; and when from the want of this proof, we fall into errors, the loss will justly fall. on those whose misconduct has destroyed the means of arriving at the truth.

The Circuit Court decided that the advancements to Barney Dilley amounted to $21,792.52. His father through a long series of years had been supplying him with money, and in the course of this time had taken from him a large

number of notes. He was the administrator of his father's estate, and as such administrator it was his duty to take charge of these notes.

He states in his testimony that his father told him that he had received from him more than his share of the estate. Other witnesses testify that his father made the same statement to him on different occasions, and he did not question its correctness. Seiss testifies that he said he had given him over $40,000. We suppose that the witness means that this statement was made to Barney ; but it is not altogether certain that this is his meaning. Barney in his answer states that with the exception of a certain judgment confessed by him in favor of his father, he has no knowledge of any evidence of his father's intention to charge him with money advanced in any manner, and that his father helped him from time to time with small amounts of money when he was in need, but that he never had the slightest idea at any time that such assistance was intended in any other way than as a gratuity, and that he is unable to say, and that no evidence can be found as to what said amounts were in the aggregate, so far as he is concerned, any more than as to his other children ; and he insists that it would be " the worst kind of injustice " to construe as advancements the amounts which he had received ; for the reason, that it is impossible to tell what amounts had from time to time been given to his several children by the decedent, or what was his intention as to the manner in which the same should be received. Appearing as a witness in his own behalf Barney testifies to various sums of money received from his father, for many of which he states that he had given notes. He says that he has not been able to find any of the notes which he had given except two ; or any note given by Mr. and Mrs. Edwards ; or any given by Dr. Everett, except those which will hereafter be more particularly mentioned. From the items mentioned in his testimony, the auditor compiled a state-

ment showing that the advancements made to him amounted to $30,894.52. It is found on page 52 of the printed record. All the charges against him in this statement, we think, are correct, except those which we proceed to mention. We think the amount advanced to go into business with Jesse Beall should be $2400, instead of $2500 as found by the auditor. We think that the evidence shows that the amount of $2500 charged as having been given to buy out White's interest is erroneous. This money was obtained on notes which were paid by Barney Dilley out of his own funds. The amount of $2000 charged Sept. 18th, 1871, evidently represented the same transaction charged under date of Sept. 17th, the same year ; and the charge of $1000, August, 1869, is for an amount included in the charge of $5000 advanced to go into business with White. These different sums aggregate $5600, and when they are deducted from the statement of the auditor, they reduce the amount to $25,294.52. But it is necessary to make some additions to this sum. In his answer to the sixty-seventh direct interrogatory, Barney Dilley identifies a bundle of notes produced and shown to him by his own counsel, and states that they were accommodation notes payable to Joseph Dilley, signed by the witness and paid by him at maturity, after they had been endorsed by Joseph Dilley and discounted in bank. And in his answer to the sixty-eighth interrogatory, he states in detail the time at which each note was paid. Written exceptions were filed to these answers in so far as they prove payment of these notes. This exception must be sustained under the decision of this Court on the former appeal. The notes standing alone implied an indebtedness to Joseph Dilley, or money advanced by him, and it was not competent under the Evidence Act for the witness to overthrow this *prima facie* proof by his own testimony. The aggregate amounts are $4671.77. In his answer to the eighty-seventh interrogatory, Barney says that the amount of $4000 given to

him by his father in a check, which was deposited in his name in the Queen City Savings Bank, was paid out by him for his father's benefit.   A written exception was also filed to this answer, so far as it showed the disposition of the money.   The exception must be sustained for the reason just stated. in reference to the notes.   All the notes, papers and checks left by the deceased were or ought to have been in the custody of the witness; and it was his duty to produce them for the purpose of this investigation. His own testimony is incompetent to repel any legal inference justly arising from them, under any circumstances embraced by the Evidence Act.   The fact that the notes were in his possession has no tendency of itself to show that he had paid them.   His own unpaid notes would naturally come into his possession after the death of his intestate, and his own qualification as administrator.   The possession therefore is no distinctive indication of a difference between notes paid by him, and those remaining unpaid. As unquestionably a number of notes of this last description have been suppressed by the witness, or some one acting in his interest, we should do far less than justice, if we did not require strict and distinct proof by competent evidence that the notes produced by the witness were paid by him in the life-time of the intestate, before we discharge him from accountability for them.   The addition of these notes and the check, to the amount found by the auditor as above corrected, will give as the result $33,966.29; and this is the amount of advancements chargeable to Barney Dilley.

The Circuit Court determined that the advancements to Edwards and wife consisted of the Forsythe farm at $1500, the Union Street house at $2350, the Union Street lot at $950, the note of Edwards and wife for $10,000, and $1000 in April, 1874, amounting to $15,800.   We think that to this amount should be added the checks of Joseph Dilley drawn to the order of Edwards, and cashed

by the Second National Bank at different times, from October, 1872, to May, 1873. These aggregate $5,500, making the amount of advancements $21,300; and we determine that this sum is to be charged to them. We do not think that there is any satisfactory proof that they gave two notes of $10,000 each. Their testimony fixes the date of the note somewhere in 1878, and states that it represented all the advancements to them; and also that they never gave any other note. They were testifying on their own offer, and their evidence was incompetent under the former decision in this case. As it was excepted to, it must be ruled out of the case. The preponderance of testimony fixes the date of the note in 1873. These witnesses in their answers to the bill of complaint, in reference to the question of advancements, make similar statements to those made by Barney Dilley in his answer.

Mr. Seiss testifies, that on one occasion Joseph Dilley showed him a number of Dr. Everett's notes payable to Dilley, and requested him to look at the amount, and that he added up the amounts of the different notes, and found the sum to be more than twenty-four thousand dollars, without interest. He says the time was soon after the return of Everett from Parkersburg, where he had been building a barrel factory, and he thinks it was in 1868. He states that sometime after this occurrence, at the request of Joseph Dilley, he wrote a note for $7,000, payable to Dilley, which in his presence Everett signed and gave to him, and that this note was in substitution for two others, which Dilley then had, and which he said he had paid to J. Philip Roman for Everett. These notes were signed by Everett, payable to Joseph Dilley and endorsed by him. Seiss also testifies that on the day he counted the notes, Joseph Dilley said to Everett something to this effect: "Now, you see what I have done; I have kept you ever since you were here, and until the Roman notes are paid; yet you will have more than your share amounts to."

There is no question whatever that Joseph Dilley had furnished sums of money to Everett at different times, and that he had taken his notes for the amounts. But the only notes produced in evidence in this case are ten which are in the ordinary form, and two with powers of attorney attached, authorizing confession of judgments. The largest of these notes is for $2500, and their total amounts are but little more than $9000. It is stated that these were not found in the trunk where Joseph Dilley kept his valuable papers, but in an old bureau drawer, in which it was supposed there were no papers of importance. We regret that the evidence is not more certain and distinct; but it is our duty to do justice, as far as it is attainable, with the materials within our reach. No trace is found of the note for $7000; nor do the notes which have been produced in evidence amount to anything near the sums which Joseph Dilley stated in Everett's presence had been given to him. It is very certain that Joseph Dilley never changed his intention that the sums of money which he had given to his children, should be charged to them in the distribution of his estate; and there is not the least reason to suppose that he destroyed any of the notes which he had required from his children. We must, therefore, adopt the calculation made by Mr. Seiss as furnishing the best means of reaching a just conclusion amid the obscurities and embarrassments of this case. The statement of the auditor, on page 53 of the printed record is correct. He deducts from the amounts stated by Seiss, the notes given by Everett before his marriage, and the Everett and Conkling note, and finds the advancements to be $29,511. We think this amount should be charged to the Everett heirs. This case is a very peculiar one. The notes which have been suppressed are chargeable to Barney Dilley, Edwards and wife, and the Everett heirs; while those chargeable to the other heirs of Joseph Dilley have been produced in evidence, and charged to them. Barney

Dilley and Edwards took possession of Joseph Dilley's notes shortly after his death in the presence of Miss Edith Dilley and Miss Ida Everett. It would be simply a denial of justice, if we should require the other heirs to prove with exactness and particularity the amounts and dates of the suppressed notes. The necessity of the case compels a reliance upon testimony which, under ordinary circumstances, would be regarded as too vague and indefinite. The law has sometimes been laid down with great severity against those who wrongfully destroy evidence. We may quote a passage or two from *Broom's Legal Maxims, p.* 843 : "An account of personal estate having been decreed in equity, the defendant charged the plaintiff with a debt as due to the estate. It was proved that the defendant had wrongfully opened a bundle of papers relating to the account, which had been sealed up and left in his hands. It further appeared that he had altered and displaced the papers, and that it could not be known what papers might have been abstracted. The Court, upon proof of these facts, disallowed defendant's whole demand against the plaintiff, although the Lord Chancellor declared himself satisfied, as indeed the defendant swore, that all the papers entrusted to the defendant had been produced ; the ground of this decision being that, *in odium spoliatoris omnia praesumuntur." Page* 845: " If a person is proved to have defaced or destroyed any written instrument, a presumption arises, that, if the truth had appeared, it would have been against his interest, and that his conduct is attributable to his knowledge of this circumstance, and, accordingly, slight evidence of the contents of the instrument will usually, in such a case, be sufficient." In dealing with the difficulties of this case, we have endeavored to draw from the competent evidence in the record only such conclusions as seemed to us legitimate and reasonable. We have not considered any of the declarations of Joseph Dilley, except such as were made in the presence

Love, *et al. vs.* Dilley, *et al.*

of the parties to be affected by them, and even as against them, we have not relied upon the declarations as fixing the exact amounts to be charged.

They showed, undoubtedly, that large sums had been advanced; but we have sought information as to amounts and details from other evidence. As to the testimony of Acklan Dilley, we may say that he is supported in many particulars by other witnesses; where he has been unsupported we have not been willing to found any conclusion upon his evidence. As the Circuit Court seems to have permitted Barney Dilley and Edwards to retain in their hands the moneys, which at one time they were ordered to bring into Court, we do not think that they should be charged with interest.

The result of our opinion is, that the order ratifying the auditor's report and the accounts must be reversed, and the cause remanded with directions to state accounts in accordance with this opinion. There must be new accounts, but no further testimony can be taken. The costs in this Court must be paid out of the estate.

*Order reversed, and*
*cause remanded.*

(Decided 22nd July, 1885.)


This case was ordered to be re-argued, and upon the re-argument, at the October Term, Judge BRYAN delivered the opinion of the Court.

The second appeal in this case was decided at the last April Term. On the petition of Dilley, and the Edwards and Everett heirs, a re-argument was ordered at the present term. We have carefully re-examined the very voluminous record in the cause, and have given a deliberate and anxious consideration to the arguments of counsel. In our judgment, the conclusions of the opinion delivered at the April Term were, with one exception, just deduc-

tions from the record then before the Court. Many papers had been omitted from the transcript under an agreement of counsel, that the originals were to be laid before the Court. These papers were, however, not brought to our attention, and, as a matter of course, had no influence on the opinion delivered. In omitting them from the record the counsel were following a practice which has become usual, but which does not receive our approval. There may be extreme cases in which it is permissible; but in ordinary cases the transcript should contain every statement, paper and document on which the opinion of this Court is to be pronounced.

We do not consider it necessary to recapitulate the details of the vast amount of evidence contained in the record. It will answer every useful purpose if we state the conclusions which are properly deduced from it. It is very certain that after Joseph Dilley's death his papers were delivered to Barney Dilley and Benjamin Edwards, by Miss Edith Dilley, (now Mrs. Brace) in the presence of Miss Ida Everett and Miss Hoblitzell, and that many of these papers have since been destroyed, or suppressed. It is also certain that the missing papers would shew large advancements to Barney Dilley, and Mr. and Mrs. Edwards, and the Everetts. There could be but one conceivable purpose in putting these papers out of the way. The spoliation, by whomsoever committed, was intended to promote the interest of Barney Dilley, the Edwards and the Everetts, by relieving them from the necessity of bringing these advancements into hotchpot. It does not appear that the papers were disturbed, which showed advancements to the other heirs of Joseph Dilley. It is our duty to prevent this contemplated injustice by all the legitimate means in our power. Exact justice is out of the question; it has been prevented by the destruction of the means of attaining it. We can, however, charge these parties with such sums as the evidence shews they received

from Joseph Dilley in his life-time, and require them to exonerate themselves by proper proof. In this way in the former opinion we charged Barney with $33,966.29. We are now, however, on a further consideration of the evidence satisfied that he ought not to have been charged with the check of May 31st, 1866, for $2000, as that was included in the $2400 charged to him on account of the Beall business. The cash book now shewn to us for the first time, convinces us that the check of January 13th, 1871, was for the Decatur street house, which was conveyed by Barney to Joseph Dilley. This item must be struck out. The affidavits and bank statements, now admitted by agreement of counsel, show that the notes for $4671.77, were accommodation notes and that the proceeds of the check on the Queen City Bank were applied to the benefit of Joseph Dilley. Both these items must be stricken out of the account. The amount chargeable to Barney Dilley would thus be reduced to $21,294.52; but the counsel for Barney Dilley, admit there was an error in his favor in one of the items, and that the amount should be $21,793.62, and it is accordingly fixed at that sum. The writer of this opinion speaking only for himself, and not with the concurrence of the Court, adheres to the views on the exceptions to testimony expressed in the former opinion. Barney Dilley was testifying in his own behalf, and under the decision in 61 *Md.*, 603, he is to be regarded as a competent witness, except so far as his testimony is affected by objections from the adverse party. This Court never decided that his evidence rested on the ground of being an admission by him; if this were the ground on which it was received, under what rule of law, could he offer his admission in his own favor? His counsel showed him a number of promissory notes, which were made by him and endorsed by Joseph Dilley, and sought to prove by him that they were accommodation notes, which he himself had paid. The notes on their face would im-

port an indebtedness to Joseph Dilley, and if the testimony were not offered for the purpose of contradicting this implication, it is difficult to see what was its significance. Confessedly under the decision just mentioned, the testimony, if objected to, could not be admitted. But it is said that it must be received, because the notes were not objected to, and this testimony qualifies and explains the notes. Is incompetent testimony to be admitted because it qualifies and explains testimony already in the cause? Suppose a witness, not a party to this suit, had produced these notes, and had stated that he had heard that they had been paid by the maker. Could it have been maintained that the whole statement must be taken together, and that the hearsay could not be rejected, if the other portion was admitted? And yet Barney Dilley testifying in his own behalf must be taken as any other witness. When an admission of a party is offered against him, the whole admission must be taken together; because the object is to lay his meaning before the jury, and it would be very unfair to mutilate his statement. And if a party asks a question of a witness he cannot distort the meaning of his answer by excluding a portion which is necessary to explain what the witness intended to say. But when testimony is offered adversely, any portion of it may be excluded which is incompetent; there is no rule of law which makes it admissible because it explains other testimony. Nearly all incompetent testimony is more or less closely connected with the competent proof as it is delivered by witnesses. The same reasons will apply to the testimony about the proceeds of the check on the Queen City Savings Bank.

The affidavits filed with the motion for a re-argument in behalf of the Edwards heirs, satisfy us that the purchase money of the Union street house was paid out of the proceeds of the check for $2500, dated October 8th, 1872. It is just that this sum ($2350) should be deducted from the amount of the advancements charged in our former

opinion. And as we understand the adverse counsel to admit the truth of these affidavits, there need be no delay in ordering the deduction. It is shewn in this motion that Joseph Dilley, on the twenty-fifth of January, 1858, released a mortgage on the Forsythe farm to the amount of twelve hundred dollars, and that Edwards conveyed the farm to him. We are asked to strike this farm from the list of advancements. On the same day Joseph Dilley conveyed the Negro Mountain farm to Edwards, the consideration named in the deed being fifteen hundred dollars. The transaction seems to have been an exchange of the two farms. It is inconsistent with the whole course of dealing between Joseph Dilley and Edwards to suppose that he was paying money to Dilley; all the money was passing from Dilley to Edwards. There are other facts alleged in the argument of counsel, which are supposed to shew errors in the sums charged as advancements. We perceive no satisfactory reason why evidence was not offered on these points when the case was pending in the Court below. A commission to take testimony was issued on the twenty-first day of May, 1881. It appears to us that there has been ample time for the parties to offer all their testimony, and that there should be no further delay, unless for some reason which has not been shewn to us. We are painfully aware that all the facts relating to these transactions are not before us; and they never will be presented for adjudication, until the suppressed papers are brought to light. Unless these should be produced, it would help the cause of justice very little to consider bits and scraps of testimony on isolated transactions. The sum of $2350 will be deducted from the advancements heretofore charged to these heirs. It will then stand at $18,950.

In the former opinion we found the amount chargeable to the Everett heirs to be $29,511. We see no reason for changing our decision on this point. It may be well to notice a remark made in that opinion about certain notes

of Dr. Everett. They were produced by Barney Dilley, who stated that they were "notes of heirs and John Everett." The notes are all signed with the name of "John Everett." There were, however, two John Everetts, father and son, and the last two notes in date were executed by John Everett, the son, after the death of his father. We did not calculate the advancements on these notes, but on the amounts stated in the testimony of Mr. Seiss, stating, however, that only ten of Dr. Everett's notes had been produced, and that their total amounts were but little more than $9000. We referred to them to shew that their aggregate amount was greatly below the sum properly chargeable to the Everett heirs as advancements. At the time, following the testimony of Barney Dilley, we did not advert to the fact that the last two notes were dated after Dr. Everett's death. It was a totally immaterial circumstance on the point we were considering, whether the number of Dr. Everett's notes was eight or ten. In either case they would not be the basis of our calculation.

We understand the complainants to insist that no portion of the assets in Court for distribution should be paid to Barney Dilley, or any of the sureties on his administration bond until the other distributees are paid their portions in full; the allegation being that the administrator is insolvent, and the sureties in failing circumstances. It is not in our power to impound the shares of these parties for this reason.

The former order must be modified according to the views expressed in this opinion.

> *Previous order of this Court rescinded, and the order appealed from reversed, and the cause remanded.*

(Decided 12th March, 1886.)


Alvey, C. J., dissented as to the sums charged to the Everett and the Edwards heirs.