## MASZCZENSKI ET AL. v. MYERS ET AL.

[No. 57, October Term, 1956.]

*Decided February 15, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*James B. Murphy,* with whom were *Leroy W. Preston, John Thomas Welsh* and *Musgrave, Preston & Boyce* on the brief, for the appellants.

*Phillips L. Goldsborough, III,* with whom were *Clark, Smith & Prendergast* on the brief, for the appellees.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment for costs rendered in favor of the defendants, appellees, in an action brought by the plaintiffs, appellants, for injuries resulting from Patricia

Maszczenski falling from a swing on defendants', appellees', playground.

Patricia, five years of age, was a paying pupil at the privately operated kindergarten and nursery, known as Pikesville Nursery and Kindergarten. About forty children were there enrolled, ranging in ages from three to five and one-half years. Mrs. Betty Brooks Myers, one of the appellees, owned the kindergarten and had been operating it twelve or thirteen years. The other appellee, J. William Myers, her husband, supervised the swings and other playground equipment on the kindergarten grounds, and chauffeured the children to and from the nursery. On the morning of June 4, 1953, while Patricia was swinging on one of the swings, she fell to the ground when the swing broke, resulting in injuries to her. The area under the swing was not completely smooth or completely rough. Mrs. Myers was present at the time she fell.

Mr. J. William Myers, called by the plaintiffs, appellants, testified that ten days or two weeks before the accident he checked the swings. "When the links started to show wear, I replaced them, and it wasn't a matter of one showed it or a half dozen, they were all replaced at one time. It was much easier to replace them all instead of having a couple of them on there that were worn worse than another one. Q. Well, on this particular occasion, you replaced one link, is that right? A. No, sir. I replaced—there is four, six swings out there. I replaced twelve links at the top, and the same at the bottom, wherever the links were wearing. Q. On this particular swing that Patricia fell from, did you replace more than one link? A. One on each side. Q. One on each side? A. That's right. Q. Then you replaced one link on each side in this particular chain from which Patricia fell? A. Yes, sir." He put the links in at the top of the chain, the same type which were used at the bottom. The link he replaced was a "spreader link". It had no apparent defect and had nothing wrong with it as far as he could see. After he put in the new spreader link he tested the swing by hanging onto the bar at the top and dropping down on the seat of the swing. After he jumped on the seat he checked the link

to see whether it was properly closed. He does not remember making any further inspection of the swing from that time until Patricia fell. He had had no particular training in connection with playground equipment. After Patricia fell he found that the link had broken at the top, which was at the end opposite to that which was spread apart when he purchased it. When asked how he knew the link broke, he stated: "Well, it was open at the top. I don't know what else could have happened to it. * * * Before I left for the hospital, I had taken all the swings up, lapped them around the top of bar, and when I came back, I removed the swings, taken them down completely, and taken them apart, and went and bought other links to put back on there." The link he replaced was a "spreader link" and weight on the chain will close the spreader. "If not, a pair of pliers or you can stand on it would bring it in close enough then that you get it started. Once it is started in, your weight will close it." He does not remember just how he put it on but he knows that after he dropped on the seat the link was completely closed. He did not use a hammer to close it because it was closed. He did not keep the broken link and did not show it to his wife. He bought the new link at Caltriders where he bought all his equipment. He thinks he closed the link either with pliers or by pulling it. When he put the new link in it had no apparent defects and he closed it completely. The swings were originally purchased from the Parent Teachers Association in Pikesville. He had never seen a link open up after it was closed. The spreader portion of the link was closed tightly when he put it on. There was no wear apparent on it then. After the accident he removed similar links from all the chains and threw them away, including the broken one. He threw the broken link away because he had no reason to keep it. The swings were in constant use from the time he replaced the links, ten days before the accident, up until the time of the accident.

Mr. Edgar Howard, called by the appellants, plaintiffs, testified that he had studied engineering and had had general experience in mechanical engineering, and had occasion to deal with chains and metals generally. He was not an expert

on swings. When a spreader link is used permanently it should be peened. When asked what peened meant, he replied: "Relieving the internal stress so that it will not have a tendency to reopen after squeezed together. I have, in my pocket here, a little larger one which is easier to see. This is a half-inch one that probably will hold maybe four, five tons, and you can see if you squeeze that together, it wouldn't stay closed together. It is not like putty. It would have a tendency to reopen. Now, after it is closed together, it should be beaten on, and have the internal stresses relieved so that it wouldn't have any tendency to open up again." He had, of course, never inspected the link in question here, and, of course, did not know whether it did in fact reopen. It would be good engineering practice to replace a link in a chain which had worn.

Mr. Hubert I. Snyder, the Director of Recreation in Baltimore County, called by the plaintiffs, appellants, testified that he was familiar with the construction and operation of playground equipment. He was not aware of any requirements or regulations in Baltimore County relating to the operation of swings on nursery school playgrounds. His department had no jurisdiction over private schools or private nursery schools. Over objection by the appellees, he testified concerning his regulations and practices as to the nature and construction of swing chains and the surface around them and said that in the public schools all playground leaders must inspect all playground equipment, including swings, daily if the playground is in operation. When asked whether he was familiar with the particular link of chain here in question, he replied: "Well, all I know, it is another link that can be used as another link in a chain, whether it be a playground swing or an automobile chain. That is the extent of my knowledge of this particular link."

Appellants claim that the doctrine of *res ipsa loquitur* applies in this case and that the trial judge erred in refusing to instruct the jury that the mere happening of the accident raised a presumption of negligence on the part of the appellees.

Mr. Myers was of course an adverse witness and when

the plaintiffs called him they had the right to "interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party." Code, 1951, Article 35, Section 8. However the plaintiff did not rebut Myers' testimony by adverse testimony and it stands on the record as an explanation of how the accident occurred. As to the effect of the production of the testimony of an adverse party and of the failure of the party introducing such evidence to rebut it, see *Morris v. Hazlehurst,* 30 Md. 362, 366; *Mason v. Poulson,* 43 Md. 161, 177; *Murphy v. Stubblefield,* 133 Md. 23, 30, 104 A. 259.

In speaking of the doctrine of *res ipsa loquitur* it was said by Judge Hammond in *Coastal Tank Lines v. Carroll,* 205 Md. 137, 145, 106 A. 2d 98: "We think that 'the facts and the demands of justice' do not require that an inference be permitted to be drawn as a matter of right where all of the circumstances of the occurrence are shown by the testimony. *Bohlen,* in the work cited, [*Studies in the Law of Torts*], at page 645, says: 'Where a presumption is recognized because the power of producing evidence is exclusively in the opponent of him who has the burden of persuasion, in so far as it is recognized for the purpose of relieving him of a burden which is impossible for him to successfully bear, that purpose is satisfied when his opponent produces evidence of what actually took place.'"

Chief Judge Sobeloff said in *Hickory Transfer Co. v. Nezbed,* 202 Md. 253, 262, 263, 96 A. 2d 241: "When a vehicle leaves a highway and crashes into a building, or a pedestrian on a sidewalk, the injured party may show the happening of the event and rest. In lieu of direct proof of negligence he may rely on the inference of negligence to be deduced from all the circumstances. In such a case it is said 'the thing speaks for itself', or *res ipsa loquitur.* The burden of proof does not shift; but the defendant then has the obligation to go forward with his proof, which is sometimes called the risk of non-persuasion. When the plaintiff invokes this procedure, thus putting his reliance upon the inference of negligence springing from the event, it has been authoritatively held that it must not appear by his own evi-

dence, or the evidence adduced in his behalf, that causes for which the defendant was in no way responsible produced the injuries for which damages are sought. Such was the holding of this court, speaking through Chief Judge Mc-Sherry, in *Strasburger v. Vogel,* 103 Md. 85, 63 A. 202. This is still the law." Here, the plaintiffs, appellants, did not merely show the happening of the accident and rest. Mr. Myers was called as a witness by the appellants and his testimony tended to prove that the collapse of the chain was caused by a latent defect in a link. He further said that he closed the link in question, but admitted that he did not peen or hammer the link because it was closed. The appellants by their witness, Mr. Howard, attempted to show that the link should have been peened so it would not reopen. As stated in *Strasburger v. Vogel, supra,* 89, 90: "To draw an inference of negligence from only a *part* of the attendant circumstances would be both illogical and erroneous, since the sum total of them must constitute the basis of the inference; and to exclude, in the mental process of deduction, a consideration of intervening, independent and efficient causes directly occasioning the injury and proven by a plaintiff himself and not attributable to a defendant, would be to predicate actionable negligence of a condition or event which in fact did not produce the injury and thus allow a recovery against a defendant on a ground for which he was in no way answerable. It is obvious, then, when a plaintiff relies on the doctrine of *res ipsa loquitur* it must *not* appear by his own evidence, or the evidence adduced in his own behalf, that causes for which the defendant was in no way responsible produced the injury for which damages are sought." See also *Walker v. Vail,* 203 Md. 321, 328, 101 A. 2d 201, and cases there cited. We are therefore of opinion that the doctrine of *res ipsa loquitur* does not apply in the instant case.

The trial judge, in his charge to the jury, instructed it that the defendants should exercise reasonable and ordinary care by proper and adequate inspection to locate defects in the swing, including the chain which held the swing together; and "There is no evidence, as I see it and as I have just indicated to you, that if this chain broke, as was outlined to

you by Mr. Myers, if it broke—I recollect no testimony to indicate that even if Mr. Myers had inspected it ten minutes before it broke, that he would have discovered that it was going to break. If on the other hand it didn't break, but it slipped out by the spreading apart of the mouth of that link which is in evidence, and as you heard described, the spreading that Mr. Snyder was afraid of happening and Mr. Howard was afraid of happening, and this accident happened as a result of that situation as distinguished from the break as described by Mr. Myers, and you find that as a fact, that that is the way that the accident happened, and you further find that a reasonable and proper inspection by the defendant in this case would have discovered that weakness, and that spreading or the condition of that link, then you would be justified in bringing in a verdict for the plaintiff. And, as I see the case, that is the only basis which would justify a verdict for the plaintiff in this case based upon the alleged negligence, the negligence of the defendants which is alleged by the plaintiffs in bringing and presenting this case to you." In other words the trial judge took from the jury any question as to whether an inspection of the chain would have shown a latent defect or any defect in the chain which caused it to break. The appellants contend that this question should have been submitted to the jury and not ruled on as a matter of law. Of course, the jury should consider only the evidence before it in deciding a particular question and should not be allowed to merely speculate. Where there is no evidence to support a jury's verdict on a particular question, that question should not be submitted to it. *Baer Brothers, Inc. v. Keller,* 208 Md. 556, 558, 119 A. 2d 410. The appellants in their brief admit: "It is true, as stated by the Court, that there was no evidence in the case to show that if an inspection was made 10 minutes before it broke would have disclosed it was going to break." However, they claim that this was because Mr. Myers threw away the broken link and they had no opportunity to examine it. They rely on *D'Anna v. United States* (C. A., 4th), 181 F. 2d 335, 337, where Judge Parker said: "There was evidence that the plane was given routine inspections after each 30 hours of

flying time; but the person who made the inspection next preceding the flight over Baltimore had no recollection apart from his recollection of custom as to the inspection made; and not only was his inspection report not produced, but there was evidence that it had been destroyed as a matter of routine procedure, although the dropping of the tank had been an occurrence of sufficient consequence to call for a board of inquiry. Surely, the presumption of negligence raised by the statute is not met by vague and unsatisfactory evidence of this sort." We fail to see how this supports appellants' contention. There is no such statutory presumption here. Probably Mr. Myers should not have disposed of the link. There is of course no evidence here that he disposed of the link intentionally for the purpose of concealing the fact that it had opened. It could hardly be contended that throwing away the broken link was sufficient evidence for the jury to find that an inspection of the link before the accident would have revealed the latent defect.

Although an inference arises from the suppression of evidence by a litigant that this evidence would be unfavorable to his cause, *Love v. Dilley*, 64 Md. 238, 1 A. 59, 4 A. 290; *Love v. Dilley*, 64 Md. 610, 6 A. 168; 20 *Am. Jur., Evidence*, Sec. 185, it is well settled that this inference does not amount to substantive proof and cannot take the place of proof of a fact necessary to the other party's case. *Eldridge v. Terry & Tench Co.*, 145 App. Div. 560, 129 N. Y. S. 865; *Rosenthal v. Ostrow*, 287 Pa. 87, 134 A. 384; *Stocker v. Boston & M. R. R.*, 84 N. H. 377, 151 A. 457, 70 A. L. R. 1320; *Northern Ins. Co. of N. Y. v. Fischer* (D. C. Mun. Ct. App.), 103 A. 2d 581; *F. R. Patch Mfg. Co. v. Protection Lodge, No. 215, I. A. M.*, 77 Vt. 294, 60 A. 74; *The Luckenbach* (D. C. Va.), 144 F. 980; *Welsh v. Gibbons*, 211 S. C. 516, 46 S. E. 2d 147, 151; *Wigmore on Evidence*, 3rd ed., Vol. II, Sec. 290, p. 179, and *ibid.*, Vol. IX, Sec. 2524, p. 441.

The appellants further contend that the trial judge committed reversible error in not allowing testimony to be offered as to what "a similar establishment or undertaking would do under like circumstances". They refer to no specific question or questions asked their witness, Mr. Hubert I. Snyder,

which he was not permitted to answer, and to no specific objections, but merely refer to his testimony as a whole. We are therefore unable to determine to just what objections they refer. However, Mr. Snyder testified, over appellees' objections, as to his regulations and practices regarding the nature and construction of swing chains and the surface around them. He also discussed from a photograph appellees' swing. He also testified as to his regulations regarding the chains, the hookup, the cross bar, the method of hookup, the required tensile strength of swing chains, the eyebolt and the clamp around the cross pipe. What other regulations the appellants desired Mr. Snyder to testify to we are unable to determine. He admitted that he had no jurisdiction over private schools or private nursery schools. He also was permitted to testify as to the requirements of his department that in the public schools all playground equipment, including swings, must be inspected at every session, daily if the playground is in operation. We fail to find any harmful error. *Adams v. Benson,* 208 Md. 261, 269, 117 A. 2d 881.

The appellants further contend: "There was further error in the Court's charge to the jury. * * * the very tenor of the Court's charge in general was prejudicial to the plaintiffs' cause." This is merely a general objection to the whole charge, without any specifications as to the particular parts. Of course, the exception must state distinctly the portion of the charge to which the objection is made. General Rules of Practice and Procedure of this Court, Part Three, Section III, Rule 6 (c) and (d) ; *Graham v. Western Md. Dairy,* 198 Md. 210, 213, 81 A. 2d 457. As we find no error the judgment will be affirmed.

*Judgment affirmed, with costs.*