## WILHELM ET UX. *v.* HADLEY

[No. 2, September Term, 1958.]

*Decided November 14, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Doris P. Scott,* for appellants.

*William B. Evans,* for appellee.

BRUNE, C. J., delivered the opinion of the Court.

Hadley, the plaintiff-appellee, brought suit against William N. Wilhelm and Emilie W. Wilhelm, his wife, the defendants-appellants, for the cost of plumbing materials and the installation thereof in a house built for the Wilhelms in Cecil County. A jury in the Circuit Court for that county returned a verdict in favor of Hadley for the full amount of his claim,.

$2,416.95. The defendants filed a motion for judgment *n.o.v.* or, in the alternative, for a new trial. This motion was overruled, judgment was entered on the verdict, and the defendants appeal.

The principal issue of fact at the trial was whether Hadley had a direct contract with the defendant owners of the property or a subcontract with one Frank Durham, trading as Durham Contracting Company. There was no written contract between Hadley and the Wilhelms. The latter claim that they had no contract with Hadley, deny that they made any promise to see that he would be paid for his work and materials, and further say that even if there was such a promise it was not in writing and was unenforceable under the Statute of Frauds as a collateral undertaking to answer for the debt of another (Durham).

The Wilhelms entered into a written contract in November, 1954, with Durham for the construction of a house at a price of $21,000. They paid the full price to Durham in instalments extending from November, 1954, to April 29, 1955, and they moved into the house on May 15, 1955. At about this time Durham quit the premises and seems to have dropped out of the picture. Some minor items of plumbing work remained to be done. So did some outside grading of substantial extent and some relatively small indoor carpentry work. The Wilhelms asked Hadley to finish the plumbing work and also asked one Jesse Gibson who, Mrs. Wilhelm said, was a sub-contractor for Durham, to do some outside grading and fix some doors and screens.

Hadley had had business dealings with the Wilhelms for some time. He brought the Wilhelms and Durham into touch with each other as a result of showing the Wilhelms some plans of Durham's of another house which Durham was building, on which Hadley was the plumbing subcontractor. Hadley testified that he had a written contract with Durham on that job.

In January, 1955, Hadley submitted to Durham an estimate for the plumbing work on the Wilhelm house. He testified that he did so at the Wilhelms' request and he denied on the stand that he had any contract with Durham. The defendants

produced a letter from Hadley's former counsel (now deceased) written to the Wilhelms notifying them of Hadley's intention "to file a mechanic's lien resulting from nonpayment of his plumbing work by the Durham Construction Company, your contractor for the building of your home." On December 29, 1955, Hadley filed in the office of the Clerk of the Circuit Court a mechanic's lien, which Hadley signed and to which he made affidavit, which had been prepared by his then counsel. This document stated that the work and materials had been contracted for by Durham. It also named the Wilhelms "and/or Francis T. Stafford and Anna M. Stafford * * * as owners or reputed owners" of the property. It recited a conveyance of the realty in question from the Wilhelms to the Staffords by a deed dated November 3, 1955.

Hadley explained not only the submission to Durham of the estimate of January, 1955, but also the rendition of a series of invoices in March and May, 1955, made out to Durham, but identifying the Wilhelm job, as having been so submitted at the request of the Wilhelms. His explanation of the statements in the notice and in the mechanic's lien about Durham being the contractor or having contracted for the work was in substance that he left these matters to his counsel. He was very vague about the letter and denied having paid close attention to statements in the mechanic's lien which his counsel had drafted. It does not appear that the mechanic's lien was ever pressed by foreclosure proceedings, and there is a stipulation in this case that it should be marked "Discharged" upon the entry of final judgment herein. In the absence of an adjudication, or other action based upon it, there is no estoppel by record. *Stinchcomb v. Mortgage Co.*, 171 Md. 317, 324, 188 A. 790; *Schultz v. Kaplan,* 189 Md. 402, 410, 411, 56 A. 2d 17. Nor, in the absence of reliance upon the letter or lien by the defendants and some action or change of position by them in reliance thereon, is there any equitable estoppel or estoppel *in pais*. *Pearre v. Grossnickle,* 139 Md. 1, 114 A. 725; *Fitch v. Double "U" Sales Corp.,* 212 Md. 324, 129 A. 2d 93. The appellants make no contention based on estoppel.

Hadley testified as to negotiations with the Wilhelms and

claimed that he had a direct agreement with them for the plumbing work. He testified to a number of direct dealings with the Wilhelms. They denied making any direct agreement with Hadley at any time, and claimed that they did not know until after Durham quit the job that Hadley had not been paid. They further said in effect that they only agreed to help Hadley to get his money from Durham.

The question of the flat contradiction of testimony as to whether Hadley had a contract with the Wilhelms or with Durham, and the Wilhelms' defense based on the Statute of Frauds were squarely submitted to the jury by the trial court's instructions. No exceptions were taken to the charge.

The defendants claim that there was no legally sufficient evidence to prove an original promise by them to pay the plaintiff for the plumbing work. This contention is based mainly upon the documentary evidence above referred to. Persuasive as that evidence might be to us, we cannot say that the plaintiff's own testimony was not sufficient, if believed by the jury, to support the verdict. It seems clear that the jury did believe the plaintiff's version. The weight of conflicting evidence is for the jury to determine. *Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 122 A. 2d 457. Nor is the way in which the bills were made out necessarily conclusive against the plaintiff, and the real question is, to whom was credit given? See *East Baltimore Lumber Co. v. Israel Congregation,* 100 Md. 125, 59 A. 180; rehearing, 100 Md. 689, 62 A. 575; *Kerner v. Eastern Dispensary & Casualty Hospital,* 214 Md. 375, 135 A. 2d 303, and cases therein cited. The verdict and these authorities seem to dispose also of the defendants' contention that any promise of theirs was a collateral undertaking to answer for the debt of another, which would be unenforceable under the Statute of Frauds.

The defendants also object to some rulings on evidence.

They attack rulings under which Mrs. Wilhelm was required to testify with regard to (a) the extent of the unfinished work which Jesse Gibson was employed to perform after Durham quit, (b) the amount of his bill and (c) the fact that it was unpaid.

The relevance of all of these questions is not very clear.

Likewise, it is hard to tell with certainty from the Record Extract whether the amount of Gibson's bill of about $1,100 was entirely for the work done after Durham quit, when he was employed by the Wilhelms, or was in part for work done as a subcontractor for Durham and in part as a direct employee of the Wilhelms. The question as stated in the defendants' brief seems to assume that the $1,100 bill pertained only to work done after Durham quit, and we shall so treat it.

We cannot say that the evidence adduced with regard to the extent and cost of work done by Gibson after Durham had quit was wholly without relevance. The extent and cost of that work had some bearing upon the truth of Mrs. Wilhelm's statement that only minor things then remained to be done; and the credibility of the parties was at the heart of the case.

The fact that Gibson's bill for his work had not been paid seems much more remote from the issue. However, we do not find any sufficient basis for holding that the admission of this evidence, even if erroneous, was prejudicial. The defendants complain that it operated to create sympathy for Hadley as tending to show that the Wilhelms paid off their contractor without making any effort to see that other workmen employed by him were protected. This is a somewhat speculative inference. A counter-inference of sympathy, equally speculative, might be drawn from the fact that the Wilhelms had to employ someone else to do work for which they had already paid Durham; and the fact that they had not actually paid the third party might offset any such sympathy and might possibly tip the scales the other way. These possible inferences and counter-inferences seem too uncertain and speculative to serve as the foundation for a finding of prejudice, even if we assume (without deciding) that the defendants' objection should have been sustained.

The defendants' last objections to rulings upon evidence rest upon Mrs. Wilhelm's being required to testify with regard to the conveyance of the property by the Wilhelms to the Staffords. The fact that such a conveyance was made seems quite immaterial to the question here in issue of whether or not Hadley had a direct contract with the Wil-

helms. The fact that there had been such a conveyance first appeared in evidence through the mechanic's lien, which was introduced by the defendants during their cross-examination of Hadley. It was not, however, material to his cross-examination based upon that document, since the real pertinence of the document for that purpose lay in the statement to the effect that Hadley had contracted with Durham. The defendants' objections to questions relating to the conveyance might well have been sustained on the ground of irrelevance. They might also have been sustained on the ground that the questions went beyond the scope of the witness' direct examination. As to the former ground, considered above, the error seems to us harmless.

As to the latter ground, these questions seem to lie in the field where a considerable discretion is vested in the trial judge. See *Williams v. Graff,* 194 Md. 516, 523, 71 A. 2d 450, and cases therein cited, and *Black v. Bank of Westminister,* 96 Md. 399, 424, 54 A. 88. See also McCormick, *Evidence,* §§ 21-25, in which the author favors the "wide-open" rather than the restrictive rule as to the scope of cross-examination. Maryland, as the cases just cited show, takes a rather middle ground position on the restrictive rule side of this question. A good deal of emphasis is placed by our cases upon the question of prejudice. Much, but by no means all, of the danger of calling an adverse party as a witness is removed under the present form of Code (1957), Art. 35, Sec. 9 (as amended by Ch. 380 of the Acts of 1939). See, however, *Maszczenski v. Myers,* 212 Md. 346, 129 A. 2d 109. Cf. *Keitz v. National Paving & Contracting Co.,* 214 Md. 479, 134 A. 2d 296, 136 A. 2d 229. In the instant case, no question of possible impeachment of Mrs. Wilhelm's testimony on this point is presented; and the mere admission of this testimony of hers on cross-examination rather than upon her being recalled as a witness for the plaintiff would not seem to have operated to produce an "injustice or injury" to the defendants. (See *Regester v. Regester,* 104 Md. 1, 13, 64 A. 286.) We are, accordingly, not prepared to hold that the judgment should be reversed on this ground for an abuse of discretion by the trial court.

The nub of the objection to this cross-examination is not to be found in the testimony that the Wilhelms conveyed the property to the Staffords for $20,000, but is in the question as to whether or not the Staffords, who were relatives of the Wilhelms, resold the property nineteen days later for $30,000. That question was asked twice, and each time the defendants' objection was sustained. There was not, however, any motion to declare a mistrial, and the only actual rulings on this question were in favor of the defendants. We also note that the defendants' motion for a new trial, made as an alternative to their motion for a judgment *n.o.v.,* did not assign the asking of this question as a ground for a new trial.

An objection based upon the asking of this question would, as the defendants observe, fall under the rules dealing with misconduct of counsel. Poe, *Pleading and Practice,* Vol. 2, *Practice* (Tiffany's Ed.), Sec. 347 A, deals with misconduct of court or counsel. He says in part: "Misconduct may be defined to be something amiss, some deviation or departure from correct behavior, not amounting necessarily to an illegal act, * * * something said or done by counsel, some improper behavior or language, which * * * injuriously affected, either clearly and actually or with reasonable probability, the verdict. The remedy * * * may be either by an application to the court itself to grant a new trial, or by making the objectionable conduct the subject of an exception, and then by taking it, upon appeal, to the Court of Appeals for review."

Though formal exceptions are no longer necessary (Rule 522 a of the Maryland Rules), and even though Rule 522 b may not be strictly applicable, no action was taken, so far as we are advised, in the trial court to raise or preserve any objection on this point, and we must, therefore, conclude that it is not properly before us for review.

In *Brawner v. Hooper,* 151 Md. 579, 594, 135 A. 420, it was said: "Counsel also relies in support of that motion [a motion to strike out the judgment] upon certain conduct of the court and counsel supposed to have been prejudicial to the appellant * * *. But no objection was made at the time to the conduct of which the appellant now complains, and it cannot under the statute, article 5, section 10, be considered

on this appeal." (Rule 885 of the Maryland Rules now embodies a limitation upon review of points or questions not raised below similar to that formerly contained in Art. 5, Sec. 10 of the Code.) See also *Lynch v. Baltimore,* 169 Md. 623, 633, 182 A. 582. In that case the court said that it could not see how the plaintiff's case was prejudiced by the action of counsel complained of, but went on to say: "yet, if we felt otherwise, we would be powerless to help him, since he then made no objection to continuing the trial. For a party to remain silent under such circumstances until after losing his case before a jury and then for the first time make objection to such procedure and be sustained therein would. be alike unfair to courts, litigants, and the public." The *Brawner* case and Code, Art. 5, Sec. 10 were then cited.

The law in other jurisdictions seems to be in accord with the views expressed in the *Brawner* and *Lynch* cases. In an annotation in 109 A.L.R. 1089, at 1094, on "Improper Offer of Evidence", it is stated: "Generally speaking, the courts seem to require that the party prejudiced by the asking of improper questions shall preserve his rights by objections, exceptions, and motions for instructions. Moreover, the view has been taken that the injured party must at once move that a mistrial be declared, for the reason, as stated, that he should not be permitted to 'speculate' upon the effect of the misconduct." See also *Morrow v. United States,* 101 F. 2d 654, 657, *certiorari* denied 307 U. S. 628.

In accordance with the views above expressed, the judgment is affirmed.

*Judgment affirmed, with costs.*