728 A.2d 727

**Carle D. KLUPT, et al.**

v.

**Alvin B. KRONGARD, et al.**

**No. 405, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

April 28, 1999.

Barton J. Sidle, Towson, (Gerson B. Mehlman and Mehlman & Greenblatt, LLC, Baltimore, on the brief), for appellants.

Arnold M. Weiner (Snyder, Weiner, Weltchek, Vogelstein & Brown, Nancy Palmer, Robert Price, BT Alex Brown, Inc., Baltimore, Thomas Zagami and Hodes, Ulman, Pessin & Katz, P.A., Townson, on brief, for appellees, Krongard, etc.); Richard S. Hoffman (Dennis Black and Williams & Connolly on the brief for appellees, G&R Video, Inc. and Greenebaum), Washington, DC, for appellees.

Argued Before MURPHY, C.J., and THIEME and JAMES S. GETTY, (Ret'd, Specially Assigned), JJ.

THIEME, Judge.

On November 18, 1997, the Circuit Court for Baltimore County (Turnbull, J.) entered a final judgment dismissing the seven-count counterclaim of Carle Klupt and his company, Sharbar, Inc. (The appellants), against a group of named counter-defendants (the appellees), for breach of contract, fraud, negligent misrepresentations, breach of fiduciary duty, and legal malpractice, in association with the licensing and production of the appellants' invention of a disposable video-cassette. The court acted after finding that Klupt had willfully and contumaciously acted with the specific intent to avert discovery and thwart justice by the destruction of discoverable evidence.

We affirm that judgment, as well as the court's disqualification of one of the appellants' substitute counsel.

### Questions Presented

The appellants appeal from that Order and present the following questions, which we have reformulated:

1. Did the trial court err in dismissing the appellants' claims for alleged spoliation of evidence?

2. Was dismissal of the appellants' claims for discovery abuse an inappropriate sanction outside the discretion of the court?

3. Did the court err in disqualifying an attorney who, prior to accepting employment, had been informed that he would be required to be a witness against his prospective client?

To all of these questions, we answer no.

### Facts and Statement of the Case

This case arises from the ill-fated attempts to license and produce a disposable cardboard videocassette designed by Carle Klupt. Klupt assigned the rights to his invention to his

corporation, Sharbar, Inc. (Sharbar), in October 1989. That same month Sharbar licensed to Philmax, Inc. (Philmax), the exclusive rights to produce the invention. Klupt eventually became convinced that Philmax had breached its licensing agreement with Sharbar, and began to seek other potential licensees. On July 24, 1990, Klupt signed a Memorandum of Understanding with Stewart Greenebaum, president of G & R Video, Inc. (G & R), spelling out a new licensing agreement contingent upon an opinion from G & R's counsel from the law firm of Williams & Connolly concerning Sharbar's rights to license the invention.

On July 18, 1990, counsel for Philmax, Gerson Mehlman, sent a letter to Klupt and Saul Leitner, Klupt's patent attorney, denying any breach of the licensing agreement and affirming Philmax's intention to enforce the agreement. Based in part on this letter, counsel for G & R gave a negative opinion with regard to Sharbar's liberty to enter into an agreement with G & R. On August 15, 1990, Philmax sued Klupt and Sharbar for a declaratory judgment concerning its rights as Sharbar's exclusive licensee. Philmax's counsel in this suit was Mehlman's law firm.

On April 26, 1991, Klupt and Sharbar signed another licensing agreement, this time with Alvin B. Krongard, acting as agent for an entity to be formed. This licensing agreement was also a contingent one, dependent on the successful resolution of the Philmax litigation. A waivable deadline for settling the litigation was set at June 30, 1991. Some payments, totaling $115,000, were made to Klupt and Sharbar, and negotiations to realize the deal continued into 1992.

### A. The Present Case

On April 19, 1994, however, suit was filed in the Circuit Court for Baltimore County by Krongard, along with Herbert D. Fried and Hanan Y. Sibel, two of Krongard's partners in this venture, against Klupt, Sharbar, and Leitner.[1] The plain-

---

1. Leitner was voluntarily dismissed on March 24, 1998.

tiffs alleged that they were defrauded into making investments in a venture for the manufacture and distribution of Klupt's disposable videocassette invention. On April 20, 1994, the day after they were served with the Baltimore County complaint, Klupt and Sharbar filed an action in the Circuit Court for Baltimore City alleging that, from 1990 to 1992, Krongard, Fried, and Sibel, the plaintiffs in the Baltimore County suit, along with other named defendants,[2] had conspired to deprive Klupt and Sharbar of the value of Klupt's disposable videocassette invention. That action was subsequently transferred to Baltimore County where it was consolidated with the previous action and designated a counterclaim. (The original plaintiffs/counter-defendants will hereafter be referred to as the appellees, and the original defendants/counter-plaintiffs will be referred to as the appellants.)

## B. Discovery

On April 21, 1994, the day after they filed suit in Baltimore City, the appellees served Charles Piven, who was then representing Klupt and Sharbar in the counterclaim, with Document Requests addressed separately to Klupt and Sharbar. The Requests called upon Klupt and Sharbar to produce "all documents relating to all oral and written communications" between Klupt, on the one hand, and any of the appellees or their lawyers, on the other. These Requests defined "documents" as including "all writings of any kind," including "all drafts, alterations [and] modifications" thereto, and all "aural records ... of any kind, including ... electronic ... records or representation of any kind, including but not limited to tapes, cassettes, discs and records."

Unbeknownst to anyone else at that time, Klupt apparently had a longstanding habit of tape-recording his telephone conversations. Between 1990 and 1992, Klupt tape-recorded telephone conversations with counter-defendants Krongard and

---

2. The other counter-defendants, appellees in the present appeal, are Howard A. Janet, Howard A. Janet, P.A., Janet & Strausberg, F. Jack Napor, WRS, Inc., Alex. Brown, Inc., and Alex Brown & Sons, Inc.

Janet and with their business lawyers, John Woloszyn and Ned Himmelrich. These conversations related to Klupt's videocassette invention. In his November 23, 1997, affidavit Klupt stated he was under the mistaken belief that so long as one of the two parties to the conversation consented to the taping it was legal to do so without the other party's consent; he stated that this was not done to gather evidence for a lawsuit. Some time in 1991, Klupt began to prepare a set of typewritten memoranda from these surreptitiously recorded conversations. Each memorandum was signed and dated, and each carried the heading "Memorandum in the Course of Business." Although some of Klupt's memoranda were not made up until months after the conversations, he dated the memoranda to make them appear to have been prepared more or less contemporaneously with the conversations to which they related.

In October 1991, Klupt hired George Liebmann to represent him and Sharbar in connection with claims arising from the videocassette invention. Klupt gave Liebmann copies of some of his memoranda. In January 1992, Klupt discharged Liebmann and replaced him with Stuart Rombro. Rombro was in turn replaced by Piven in late 1993. While Klupt informed his lawyers about his conversations with the appellees, he did not disclose to his lawyers his taping practices or the existence of the tapes. For example, when questioned in his deposition about Piven's inquiry to him concerning his methods in gathering the information in these memoranda, Klupt replied only that he got "off the phone and type[d] it, scribble[d] it down, dictate[d] it into a recorder or electronic, I believe I said ma[d]e electronic memorandums."

After the appellees experienced scheduling difficulties with the deposition of Klupt, the court, upon motion by the appellees, on November 10, 1994, ordered Klupt to appear for his scheduled deposition. Klupt promptly filed a Motion for Reconsideration, wherein counsel for Klupt stated that he had a previously scheduled deposition in another case. This led to the filing by the appellees of Applications for Orders to Show Cause for Contempt, wherein it was alleged that no such prior

deposition was scheduled as alleged in Klupt's Motion for Reconsideration. On November 23, 1994, the court denied Klupt's Motion for Reconsideration, and ordered counsel for Klupt to show why counsel should not be held in contempt for falsely claiming to the court that he was unavailable for the scheduled deposition.

When the deposition finally began on November 29, 1994, Piven, counsel for Klupt, produced a "Privilege Log." No mention of Klupt's memoranda was made. When questioned about the request for production of documents, Klupt acknowledged that he had received a copy of the request shortly after it was served. He testified that he had endeavored to produce all documents. When questioned about the existence of documents relating to his conversations with the appellees, Klupt revealed that he had made typewritten memoranda of those conversations. No reference was made to his taping. Klupt stated that he prepared about twenty such memoranda from both memory and handwritten notes. He claimed to have thrown away the notes. When questioned about his failure to produce these memoranda, Klupt testified that he had given the memoranda for the first time to his counsel the day before the deposition began. Klupt's counsel interjected that he had "not had a chance to go through everything that was given to me yesterday," and that, as a result, he had removed the memoranda from the group of papers that he had produced at the start of the day's deposition. At the conclusion of the first day, counsel for the appellees called upon Klupt to produce the typed memoranda. Klupt's counsel indicated he would comply.

That evening, Klupt's counsel communicated to counsel for the appellees that Klupt would continue to withhold most of the memoranda, and would assert his Fifth Amendment privilege against self-incrimination as his reason for not producing them.

Upon the resumption of the deposition the next morning, and after his counsel produced copies of four memoranda, Klupt stated that he intended to take, and was taking, the

Fifth Amendment as to the rest of the memoranda. Counsel for the appellees asked that Klupt and his counsel immediately prepare a privilege log listing the documents that Klupt was refusing to produce. Klupt and his counsel left the deposition site to compile the list. When Klupt and his counsel returned to the deposition without the list, his counsel announced that "a conflict has arisen" between himself and Klupt and that Klupt intended to "consult with other counsel" about terminating Piven. Klupt refused to go on with the deposition, notwithstanding the court's November 10 Order.

On December 29, 1994, Gerson Mehlman entered his appearance for the appellants, replacing Piven. His appearance was immediately challenged by the appellees, and he was disqualified by the court on February 1, 1996. (His disqualification is discussed at length below.)

On February 19, 1996, substitute counsel Gilbert H. Robinette entered his appearance for Klupt and Sharbar. By a letter dated March 29, 1996, Robinette produced copies of the memoranda that Klupt had earlier claimed to have given Piven during his 1994 deposition session. During the second day of the 1994 session, Klupt was asked about the missing documents:

Q. Are there more than twenty typewritten memoranda of conversations with the parties to this case?

A. I really don't recall. I would think.

Q. What's that?

A. I would think it's about twenty.

Instead of twenty memoranda, there were more than fifty, half of which were rewritten versions. Klupt's lawyer claimed that these rewritten versions were merely "condensed" memoranda from which Klupt had "factor[ed] out what some people might consider extraneous matters." Neither Klupt nor his lawyer volunteered at that time—or at any other time—that Klupt had recorded his conversations with the appellees, and had destroyed the recordings after they had been sought in discovery.

The resumption of Klupt's deposition was set for October 4, 1996. On October 3, 1996, Klupt's counsel announced that he had just learned that Klupt had at his home "thousands and thousands" of documents relating to the case. Klupt's deposition was postponed until the newly revealed documents could be reviewed by Klupt's counsel and produced.

At the deposition, which was eventually reconvened on June 17, 1997, Klupt was forced to admit that he had tape-recorded his conversations with the appellees. When Klupt was questioned again about his prior testimony from the second day of the prior deposition session, and the fact that he had given Piven the memoranda the day before his deposition was scheduled, Klupt now stated he gave these initial memoranda which he made from the tapes to Piven prior to the filing of suit and that Piven had used these documents over several months prior to and during the suit. Klupt also acknowledged that he generated his memoranda from those recordings.

When Klupt was asked about the destruction of these tapes he first testified:

Q. Now when was it that you destroyed the tapes of your conversations with other parties to this case relating to this case?

A. I just don't remember the time.

Q. Well, was it before or after your deposition in November 1994 that you destroyed the tapes?

A. It was definitely before the deposition.

. . . .

Q. Did you destroy the tapes closer to September of 1993 or closer to December of 1994?

A. Mr. Weiner, I think I have already told you. I don't remember.

Prior to his deposition, Piven had asked Klupt if he had tape-recorded any of the conversations for which he had a memorandum. When questioned about this conversation during which he was informed of the illegality of the taping, which occurred approximately one month before his deposition,

Klupt eventually conceded: "I destroyed the tapes when they told me that possession of them was against the law." At that time, the case had been pending for six months, and Klupt had been served with the appellees' Request for Production.

With regard to the second set of memoranda, Klupt stated that in October 1994 he rewrote his memoranda at Piven's request to remove meaningless material. The first set of memoranda contained long quotations attributed to the participants. Klupt removed the quotations; he claimed that he did so because he could not "be absolutely certain as to what's in quotations being a direct quotation." The rewritten and backdated memoranda bore the identical legend "Memorandum in the Course of Business."

Klupt testified he prepared his memoranda from the tape recordings but that he could not recall whether, and to what extent, any single memorandum was derived from a tape recording. Klupt asserted, for example, that he could not tell whether a memorandum of an April 2, 1992, conversation, containing four and one-half pages of single-spaced dialogue replete with incomplete sentences, was derived from a recording. Klupt claimed that "under the proper circumstances" he was capable of committing such lengthy conversations to memory and of accurately recreating those conversations in memoranda.

On September 4, 1997, the appellees filed a Renewed Motion of Counter–Defendants to Dismiss Counterclaim for Discovery Abuse and Contempt of Court, requesting the court to dismiss the counterclaims of Klupt and Sharbar. The motion alleged: Klupt made surreptitious recordings of telephone conversations from which he made memoranda; he intentionally destroyed the tape recordings; he created dummy versions from the original memoranda; he withheld both the original and dummy memoranda; he falsely affirmed in his deposition that he had produced all documents. A hearing on the motion was held on November 4, 1997. The court by written Opinion and Order filed November 14, 1997, dismissed the appellants' claims for reasons of discovery abuse. Upon

motion by the appellees under Rule 2–602(b), the court made its Order a final judgment on November 18, 1997. The appellants filed motions to alter or amend the November orders, both of which were denied on December 22, 1997. The court's order also stayed all proceedings in the original claim, pending any appeals of its order of dismissal.

## C. Disqualification of Counsel

The appellants filed their original complaint on April 20, 1994, followed by amended complaints on April 25, 1994, and August 1, 1994. In these complaints, the appellants alleged that the appellees conspired to defraud the appellants of the value of their disposable videocassette invention by working in conjunction with Philmax to keep alive litigation between Philmax and the appellants in order to depress the value of the invention. These allegations were premised in part on the facts noted above, namely, the termination of the Klupt/Sharbar–G & R agreement because G & R's counsel refused to give a favorable opinion concerning Sharbar's rights with regard to the Philmax license, which opinion was based in part on a letter from Gerson Mehlman, counsel for Philmax. The Klupt/Sharbar–Philmax litigation was eventually settled. Attorney Mehlman, whose firm represented Philmax in the litigation, was also involved in the settlement.

Within days of being served with the appellants' original complaint, counsel for appellee G & R called Mehlman to discuss the allegations and to advise Mehlman that he was viewed as a critical witness in this case. Those conversations were held on April 21 and 26, 1994.

On December 29, 1994, Mehlman entered his appearance as counsel for the appellants, substituting for the withdrawing Piven. The appellees promptly moved to disqualify Mehlman on January 13, 1995. On February 21, 1995, Mehlman, acting for the appellants, filed a Third Amended Complaint (TAC). The TAC deleted several causes of action relating to the termination of the agreement entered into between G & R and Klupt on July 24, 1990. Notwithstanding Klupt's contrary allegations in three separate complaints, he filed a supplemen-

tal affidavit stating that G & R "was within its legal rights to terminate the July 24, 1990 Agreement."

Retired Judge Leonard Jacobson, acting as a special master appointed by the Court, held hearings on the disqualification issue, and in a Report dated May 16, 1995, recommended that Mehlman be disqualified. The appellants filed exceptions with Judge Turnbull. On February 1, 1996, the court heard argument concerning the appellants' exceptions to the special master's recommendation. At the February 1, 1996, hearing, Mehlman admitted that, based on the allegations in the original three complaints, he should not have entered an appearance as Klupt's attorney because he was a necessary witness. He claimed, however, that because he filed a new complaint eliminating certain causes of action the conflict disappeared. The court disagreed.

At the February 1, 1996, hearing, the court ruled that Mehlman would likely be called as a witness *against* the appellants and that, under the circumstances, Mehlman was disqualified from representing Klupt. Mehlman's only participation in this litigation was to file the TAC and to contest the motion to disqualify him. The appellants promptly obtained substitute counsel, Gilbert Robinette. There is no allegation that Robinette did not subsequently provide adequate representation to the appellants. The appellants have made no argument that the disqualification of Mr. Mehlman prejudiced them in any manner.

Further relevant facts are included in the following discussion.

### *Discussion*

### *I. Discovery Abuse*

### *Standard of Review*

■ When reviewing the circuit court's imposition of sanctions for discovery abuse, we are bound to the court's factual findings unless we find them to be "clearly erroneous." Md. Rule 8–131(c); *cf. North River Ins. Co. v. Mayor & City*

*Council of Baltimore,* 343 Md. 34, 56–57, 680 A.2d 480 (1996). Thus, our scope of review is narrow and our function is not

> to substitute our judgment for that of the fact finder, even if we might have reached a different result. Instead, we must "decide only whether there was sufficient evidence to support the trial court's findings. In making this decision, we must assume the truth of all the evidence, and of all the favorable inferences fairly deducible therefrom, tending to support the factual conclusions of the lower court."

*Nicholson Air Servs. v. Board of County Comm'rs of Allegany County,* 120 Md.App. 47, 67, 706 A.2d 124 (1998) (quoting *Mercedes–Benz of N. Am., Inc. v. Garten,* 94 Md.App. 547, 556, 618 A.2d 233 (1993)).

When considering the actual imposition of discovery sanctions by the trial court, our review is narrower still. This narrow review is mandated by the wide discretion of the trial court to manage the discovery phase of cases before it.

> "Maryland law is well settled that a trial court has broad discretion to fashion a remedy based on a party's failure to abide by the rules of discovery." Indeed, in order to impose sanctions, a court need not find " 'wilful or contumacious behavior.' " Rather, in imposing sanctions, a trial court has "considerable latitude."

> Our review of the trial court's resolution of a discovery dispute is quite narrow; appellate courts are reluctant to second-guess the decision of a trial judge to impose sanctions for a failure of discovery. Accordingly, we may not reverse unless we find an abuse of discretion. In *Mason v. Wolfing,* 265 Md. 234, 236, 288 A.2d 880 (1972), the Court said: "Even when the ultimate penalty of dismissing the case or entering a default judgment is invoked, it cannot be disturbed on appeal without a clear showing that [the trial judge's] discretion was abused."

*Warehime v. Dell,* 124 Md.App. 31, 43–44, 720 A.2d 1196 (1998) (alteration in original) (citations omitted).

### Sanctions for Discovery Abuse Under the Rules

The Maryland Rules provide for a wide variety of sanctions, including the most severe penalties, for failures of discovery. "[T]he court, if it finds a failure of discovery, may enter such orders in regard to the failure as are just, including . . . [a]n order . . . dismissing the action. . . ." Md. Rule 2–433(a)(3). Such an order may be made "[u]pon a motion filed under Rule 2–432(a)." Md. Rule 2–433(a). Maryland Rule 2–432(a) specifies a number of conditions under which "[a] discovering party may move for sanctions under Rule 2–433(a), without first obtaining an order compelling discovery under section (b) of this Rule," including the case when "a party fails to serve a response . . . to a request for production or inspection under Rule 2–422, after proper service." Md. Rule 2–432(a).

Likewise, under Rule 2–433(b), the court may impose the sanction of dismissal for the failure to comply with an order compelling discovery, including an order compelling a response to a request for production, of the type noted above, and an order compelling a party "to comply with a request for production or inspection under Rule 2–422." Md. Rule 2–432(b)(1)(E).

The Rules do not deal explicitly with the destruction of discoverable evidence. But they do clearly allow for the dismissal of a party's claims for failure to respond to a request for production and for failure to obey an order compelling such a response or the actual production itself. Destruction of evidence such as was found in this case would render hollow any response to a request for production, even if timely filed, just as it would render an order to compel moot. If dismissal is permissible in those cases, it would seem to be *a fortiori* permissible in a case of destruction of discoverable evidence. *Cf. White v. Office of the Public Defender for the State of Md.*, 170 F.R.D. 138, 148 n. 8 (D.Md.1997) ("A party who has removed any possibility of warnings by destroying evidence before a court order can be issued cannot in fairness thereby immunize herself from the ultimate sanction of dismissal."); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72

(S.D.N.Y.1991) (citing *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 90 F.R.D. 613, 620–21 (N.D.Ill.1981)) ("Even though a party may have destroyed evidence prior to issuance of the discovery order and thus be unable to obey, sanctions are still appropriate under [Federal Rules of Civil Procedure] Rule 37(b) because this inability was self-inflicted."). It seems to us that that is likewise an appropriate conclusion under the Maryland Rules.

In *Womble v. Miller*, 25 Md.App. 656, 336 A.2d 138 (1975), the appellant made an interlocutory challenge of a monetary discovery sanction imposed on him. The underlying dispute involved an assault for which the appellant brought suit. The appellant's deposition was scheduled, and he appeared for his deposition, but refused to proceed in a normal fashion. The deposition was halted before any questions were put to the appellant. When the appellant was sanctioned by the court for his refusal to be deposed, he appealed, claiming that the rule regarding failures of discovery, the present Maryland Rule 2–432, did not cover the case. The rule allows for court orders or sanctions for a failure to appear or to answer questions. But the appellant neither failed to appear nor failed to answer questions since none were put to him. This Court concluded, however, that the case did come under the rule, reasoning:

> The Court of Appeals in adopting [the predecessor rule to Maryland Rules 2–432 and 2–433] did not seek to provide therein against every conceivable contingency that could arise, but rather applied a broad rule vesting the trial court with discretion as to the rule's enforceability. "A large measure of discretion is entrusted to trial judges in Maryland in applying sanctions for failure to comply with the rules relating to discovery."

*Id.* at 666–67, 336 A.2d 138 (quoting *Tydings v. Allied Painting & Decorating Co.*, 13 Md.App. 433, 436, 283 A.2d 635 (1971)). Likewise, we conclude that such an expansive reading of the discovery rules gives trial courts the discretion to

impose Rule sanctions for the destruction of evidence, a discovery abuse not directly covered by the Rules.

■ Given the importance and novelty in Maryland of the issue of sanctions for destruction of discoverable evidence, we will not, however, rest our decision solely on this basis. Rather, we will also consider the inherent authority of the court to regulate the discovery process. When, as here, there is little Maryland precedent, we look to cases interpreting analogous federal rules. *See Pleasant v. Pleasant*, 97 Md. App. 711, 732, 632 A.2d 202 (1993) (citing *Bartell v. Bartell*, 278 Md. 12, 18, 357 A.2d 343 (1976) (quoting *Snowhite v. State ex rel. Tennant*, 243 Md. 291, 308–09, 221 A.2d 342 (1966))).

### Inherent Authority to Regulate Discovery

The United States Supreme Court has been constant in asserting the inherent authority of courts of law properly to regulate proceedings that come before them. "The inherent powers of federal courts are those which 'are necessary to the exercise of all others.'" *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812)). Those powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962).

Proceeding from this understanding of inherent authority and powers, the federal courts have frequently dealt with cases of discovery misconduct that do not fall directly under the federal rules but in which sanctions of the type allowed under Rule 37 would nevertheless be appropriate. The consensus is that, whether or not the discovery sanctions rule applies, the court retains and "relies on its inherent power to regulate litigation, preserve and protect the integrity of proceedings before it, and sanction parties for abusive practices." *Capellupo v. FMC Corp.*, 126 F.R.D. 545, 551 (D.Minn.1989); *see also White*, 170 F.R.D. at 148–49; *Turner*, 142 F.R.D. at

72; *National Ass'n of Radiation Survivors v. Turnage,* 115 F.R.D. 543, 556 (N.D.Cal.1987).

█ We thus conclude that our courts "have the power to sanction the destruction of evidence, whether that authority is derived from [the discovery sanctions rule] or from their inherent powers." *Turner,* 142 F.R.D. at 72.

### Evidentiary Inference vs. Discovery Sanction

The appellants rest the bulk of their argument against the imposition of the sanction of dismissal for destruction of evidence upon their claim that "[n]o case decided by the Maryland appellate courts ruled that dismissal of the case was the proper remedy" for such destruction. Rather, they assert, numerous cases have held that spoliation of evidence should lead the trier of fact to draw a negative evidentiary inference or presumption against the spoliator. *See Larsen v. Romeo,* 254 Md. 220, 228, 255 A.2d 387 (1969); *Maszczenski v. Myers,* 212 Md. 346, 355, 129 A.2d 109 (1957); *Anderson v. Litzenberg,* 115 Md.App. 549, 561–62, 694 A.2d 150 (1997); *DiLeo v. Nugent,* 88 Md.App. 59, 71, 592 A.2d 1126, *cert. granted,* 325 Md. 18, 599 A.2d 90 (1991);[3] *Miller v. Montgomery County,* 64 Md.App. 202, 214–15, 494 A.2d 761, *cert. denied,* 304 Md. 299, 498 A.2d 1185 (1985); *Burkowske v. Church Hosp. Corp.,* 50 Md.App. 515, 523–24, 439 A.2d 40 (1982).

█ In making that argument, the appellants have neglected two crucial principles. First, we remind them that litigation proceeds by stages and that the different stages are governed by different rules and standards. *See* Md. Rules 2–101 to 2–652. Discovery is one such stage and it clearly has its own unique rules. Md. Rules 2–401 to 2–434. As noted above, the penalties for abusive conduct during discovery, including dismissal with prejudice, can be harsh. But it is the court alone, not the trier of fact, who is the master of the discovery phase. "Maryland law is well settled that a trial

---

**3.** Case was dismissed at the request of counsel in an unreported decision dated September 16, 1992.

court has broad discretion to fashion a remedy based on a party's failure to abide by the rules of discovery." *Bartholomee v. Casey,* 103 Md.App. 34, 48, 651 A.2d 908 (citing *Taliaferro v. State,* 295 Md. 376, 398, 456 A.2d 29, *cert. denied,* 461 U.S. 948, 103 S.Ct. 2114, 77 L.Ed.2d 1307 (1983)), *cert. denied,* 338 Md. 557, 659 A.2d 1293 (1995).

None of the cases cited by the appellants address the question of spoliation of evidence dealt with by the court *during discovery.* As we noted in *Beck v. Beck,* 112 Md.App. 197, 684 A.2d 878 (1996), *cert. denied,* 344 Md. 717, 690 A.2d 523, *and cert. denied,* 345 Md. 456, 693 A.2d 354 (1997), "Appellant has not cited, nor have we found, any Maryland case holding that a trial court's exclusion of evidence based on a discovery violation, of the nature of that in the case at bar, constituted an abuse of discretion." *Id.* at 209–10, 684 A.2d 878. Likewise, in the present case, the appellants have not cited a single Maryland case holding that a trial court's dismissal of claims based on a *discovery violation,* like the one in the case *sub judice,* constituted an improper judgment.

Second, we note that the destruction or spoliation of evidence doctrine is itself flexible and versatile. Various courts have recognized it as an independent cause of action, a defense to recovery, an evidentiary inference or presumption, and as a discovery sanction. It is regarded as both a substantive rule of law and as a rule of evidence or procedure. Its application depends on the attendant circumstances. *See generally* Robert L. Tucker, *The Flexible Doctrine of Spoliation of Evidence,* 27 U. Tol. L.Rev. 67 (1995). Consequently, we see absolutely no contradiction in recognizing that destruction of evidence may lead to sanctions like dismissal when addressed during discovery, while the same offense may raise only an evidentiary presumption when dealt with during trial.

█ Finally, the appellants raise but do not really argue the contention that their constitutional rights to a trial by jury were violated because their claims were dismissed as a sanction for discovery abuse before reaching a jury. A similar contention was raised by the appellants in *Billman v. State of*

*Maryland Deposit Insurance Fund Corp.,* 86 Md.App. 1, 585 A.2d 238, *cert. denied,* 323 Md. 1, 590 A.2d 158, *cert. denied,* 502 U.S. 909, 112 S.Ct. 304, 116 L.Ed.2d 247 (1991).

> Appellants contend that they were deprived of their constitutional right to a jury trial on the issue of damages. Article 23 of Maryland's Declaration of Rights clearly guarantees the right of trial by jury only in certain instances. The right is guaranteed 1) when issues of fact exist; 2) in a civil proceeding; 3) in a court of law; and 4) where the amount in controversy exceeds five hundred dollars. It follows then, that where liability has been decided by a default, where there is no issue of fact for a jury to decide ..., there is no constitutional right to a jury trial....

*Id.* at 13, 585 A.2d 238 (footnote omitted). The same conclusion follows for a dismissal with prejudice, and thus we find the appellants' assertion to be without merit.

### *Destruction of Discoverable Evidence*

■ The circuit court wisely followed a recent decision of the U.S. District Court for Maryland, which clearly laid out the consensus rules for sanctioning destruction of evidence. *See White,* 170 F.R.D. at 147–48. The *White* Court identified four elements generally regarded as being prerequisite to a court's imposition of spoliation sanctions:

> (1) An act of destruction;
> (2) Discoverability of the evidence;
> (3) An intent to destroy the evidence;
> (4) Occurrence of the act at a time after suit has been filed, or, if before, at a time when the filing is fairly perceived as imminent.

*Id.* at 147 (citing Jamie S. Gorelick, et al., *Destruction of Evidence* §§ 3.8 –.12, at 88–109 (1989)). The court in the present case addressed each of these elements in turn.

First, the court had no difficulty finding that an act of destruction, in this case physical destruction, took place. Indeed, appellant Klupt admitted that he had "smash[ed the tapes] with a hammer." Neither was there any question about

the discoverability of the evidence. The *White* Court noted that for the purposes of discovery sanctions discoverable evidence is anything " 'reasonably calculated to lead to the discovery of admissible evidence, ... reasonably likely to be requested during discovery, and/or [which] is the subject of a pending discovery request.' " *Id.* at 148 (quoting *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443, 1455 (C.D.Cal.1984)) (alterations in original). The court in the present case found that the destroyed tapes were subject to a request for production of documents filed by the appellees in April 1994. The discovery request included all documents, including electronically recorded tapes and cassettes, relating to communications between the parties. Again, appellant Klupt admitted that the destroyed tapes included communications between the parties.

The circuit court also found that appellant Klupt acted intentionally when he destroyed the tapes. For purposes of the discovery sanctions inquiry,

> [i]ntent means knowledge, actual or constructive, that discoverable evidence is relevant to pending litigation.... Actual knowledge refers to a subjective disposition to destroy the evidence. At the same time, a party may be deemed to constructively know that a document is relevant to litigation because [he] was placed on notice by the opposing party. "Courts have held that parties are placed on notice that documents are relevant to litigation by court orders, discovery requests, and preservation agreements."

*Id.* (quoting Gorelick, *supra*, § 3.11, at 98) (citations omitted). The court concluded, based on appellant Klupt's admitted concealment of the tapes and the content of the tapes as discerned from memoranda prepared by Klupt from the tapes, that Klupt had actual knowledge of the relevance of the tapes, and therefore acted intentionally when he destroyed them. The court also found, based again on appellant Klupt's own admissions, that the destruction of the tapes took place as much as six months after the appellees' First Request for Production of Documents was served on the appellants' agent. If nothing else, the appellants clearly had constructive knowl-

edge of the relevance of the taped conversations and thus intent to destroy that evidence.

Finally, the court determined that the destruction took place after the filing of the suit. Indeed, by Klupt's own confession in his deposition testimony, he destroyed the tapes as much as six months *after* the appellees had requested their production.

There is no question but that the court's findings are not clearly erroneous. Given the weight of the evidence and the fact that most of it came from appellant Klupt's own admissions, there would seem to have been little choice but for the court to have found as it did, namely, that the appellants had in fact intentionally destroyed evidence.

### Dismissal Within the Court's Discretion

█ Finally, the court proceeded to a discussion of the scope of the sanction it would impose on the appellants. Following *White*, 170 F.R.D. at 151, the court measured its sanction against the prejudice to the appellees caused by the appellants' action. Strictly speaking, such a calculation is unnecessary under Maryland law. "The Maryland Rules do not require that a showing of prejudice is necessary to support the entry of a default judgment for failure to comply with the discovery rules. In fact, Md. Rule 2–433(a) clearly provides that once the trial court finds a failure of discovery, it may impose various sanctions." *Billman*, 86 Md.App. at 11, 585 A.2d 238.

█ The trial court did recognize, however, that the imposition of sanctions is within its wide discretion. *North River Ins. Co.*, 343 Md. at 47, 680 A.2d 480; *Mason v. Wolfing*, 265 Md. 234, 235, 288 A.2d 880 (1972); *Beck*, 112 Md.App. at 209–10, 684 A.2d 878; *Pleasant*, 97 Md.App. at 733, 632 A.2d 202. That rule holds even for severe sanctions like dismissal. "Even when the ultimate penalty of entry of a default judgment is invoked, it cannot be disturbed on appeal without a clear showing of abuse of discretion." *Lone v.*

*Montgomery County*, 85 Md.App. 477, 485, 584 A.2d 142 (1991).

Discretion does, however, require some commensuration between the abusive conduct and the sanction, particularly when the sanction is of the most severe type. "The dismissal of a claim, however, is among the gravest of sanctions, and as such, is warranted only in cases of egregious misconduct such as 'wil[l]ful or contemptuous' behavior, 'a deliberate attempt to hinder or prevent effective presentation of defenses or counterclaims,' or 'stalling in revealing one's own weak claim or defense.'" *Manzano v. Southern Maryland Hosp., Inc.*, 347 Md. 17, 29, 698 A.2d 531 (1997) (alteration in original) (citations omitted). In some very specific circumstances, as in the areas of child custody and support, even further scrutiny will be given to dismissals and default judgments for discovery abuse. "Where there exists a discovery violation in a child support matter, as always, the best interest of the child is paramount and a trial court must exhaust every available remedial step to enforce discovery before the extreme sanction of dismissal may be ordered." *Rolley v. Sanford*, 126 Md.App. 124, 131, 727 A.2d 444 (1999).

In the present case, which does not contain any such special circumstances, the court explicitly found that appellant Klupt had acted "willfully and contumaciously." The court noted in particular that Klupt deliberately concealed the existence of the tapes, even from his own counsel, made various memoranda from the tapes, including a backdated set of such memoranda, and then physically destroyed the tapes during a time when the litigation had been ongoing for several months. There is nothing in the court's findings that we can deem to be clearly erroneous.

Our courts have previously upheld, as within the court's discretion, dismissal of the offending party's claims as the sanction for discovery abuse, *Peck v. Toronto*, 246 Md. 268, 270, 228 A.2d 252, *cert. denied*, 389 U.S. 868, 88 S.Ct. 139, 19 L.Ed.2d 142 (1967); *Rubin v. Gray*, 35 Md.App. 399, 400, 370 A.2d 600 (1977), as well as the entry of a default judgment.

*See Lynch v. R.E. Tull & Sons, Inc.*, 251 Md. 260, 260–62, 247 A.2d 286 (1968); *Pacific Mortgage & Inv. Group, Ltd. v. Horn*, 100 Md.App. 311, 324–26, 641 A.2d 913 (1994); *Billman*, 86 Md.App. at 7–13, 585 A.2d 238; *Lone*, 85 Md.App. at 485–87, 584 A.2d 142; *Berkson v. Berryman*, 63 Md.App. 134, 141–44, 492 A.2d 338, *cert. denied*, 304 Md. 296, 498 A.2d 1183 (1985).

In the present case, where the court found the appellants had clearly destroyed discoverable evidence and had done so willfully and contumaciously, we find no abuse of discretion in the court's dismissal of the appellants' claims.

## II. Disqualification of Counsel

### Standard of Review

The trial court's consideration of a motion to disqualify opposing counsel requires several steps. First, the moving party must identify a specific violation of a Rule of Professional Conduct. *See Peat, Marwick, Mitchell & Co. v. Los Angeles Rams Football Co.*, 284 Md. 86, 96, 394 A.2d 801 (1978) (quoting *Woods v. Covington County Bank*, 537 F.2d 804, 813 (5th Cir.1976)). Next, the court must determine whether there was an actual violation of the rule. *See Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir.1997) (citing *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 (11th Cir.1982)). It is well settled, however, that the court's finding of a violation of an ethical rule does *not* result in automatic disqualification. *See Central Milk Producers Coop. v. Sentry Food Stores, Inc.*, 573 F.2d 988, 991 (8th Cir.1978) (citing *Meat Price Investigators Ass'n v. Spencer Foods, Inc.*, 572 F.2d 163 (8th Cir.1978); *W.T. Grant Co. v. Haines*, 531 F.2d 671, 676–77 (2d Cir.1976); *Fisher Studio, Inc. v. Loew's, Inc.*, 232 F.2d 199 (2d Cir.), *cert. denied*, 352 U.S. 836, 77 S.Ct. 56, 1 L.Ed.2d 55 (1956)). Rather, even after the court's finding of an ethical violation, it remains within the discretion of the court whether to impose the sanction of disqualification. *See Peat, Marwick*, 284 Md. at 96, 394 A.2d 801 (citing *Central Milk Producers*, 573 F.2d at 991; *W.T.*

*Grant Co.,* 531 F.2d at 676; *Waters v. Western Co. of N. Am.,* 436 F.2d 1072, 1073 (10th Cir.1971)).

Consequently, appellate review of the granting of a motion for disqualification necessitates a multi-step inquiry. The factual findings of the court regarding the violation will be reviewed under the "clearly erroneous" standard. *See* Md. Rule 8–131(c); *see also Attorney Grievance Comm'n v. Miller,* 301 Md. 592, 602, 483 A.2d 1281 (1984) (citing *Attorney Grievance Comm'n v. Collins,* 295 Md. 532, 548, 457 A.2d 1134 (1983) (citing *Attorney Grievance Comm'n v. Kahn,* 290 Md. 654, 678, 431 A.2d 1336 (1981))). The court's conclusion that an ethical violation occurred is "a legal conclusion subject to full appellate review." *Schlumberger Techs.,* 113 F.3d at 1561; *cf. Attorney Grievance Comm'n v. Gavin,* 350 Md. 176, 189, 711 A.2d 193 (1998) (in disciplinary matters, Court of Appeals will make ultimate decision as to whether a lawyer has violated professional rules); *Attorney Grievance Comm'n v. Adams,* 349 Md. 86, 93, 706 A.2d 1080 (1998) (same). Finally, the court's discretionary choice of disqualification as a sanction is reviewed only for an abuse of that discretion. *Peat, Marwick,* 284 Md. at 97, 394 A.2d 801 (citing *Donlon Indus., Inc. v. Forte,* 402 F.2d 935, 937 (2d Cir.1968); 9 *Moore's Federal Practice* ¶ 110.13(10), at 190 (2d ed.1975)).

### Factual Findings

The court, adopting the report of the special master in a bench opinion, found that Mehlman had acted as counsel for Philmax and in that capacity had written to the appellants a letter dated July 18, 1990, asserting Philmax's rights in the dispute between those parties. That dispute involved some of the same subject matter as the present litigation. Mehlman was informed by Hoffman in telephone conversations held on April 21 and 26, 1994, about the present litigation and that he would be a potential witness for the appellees. It was also found that Mehlman's testimony, if consistent with his prior statements, would be in conflict with that of the appellants. None of these findings, supported as they are by the motions, exhibits, and admissions of the parties—particularly, Mehl-

man's July 18, 1990, letter; Hoffman's affidavit; and Mehlman's argument before the court on February 1, 1996—are really in dispute. They are certainly not clearly erroneous.

From these facts, the court concluded that Mehlman's appearance on behalf of the appellants in the present litigation constituted violations of MLRPC Rules 3.7 [4] and 1.7.[5]

### *MLRPC Rule 3.7*

 Rule 3.7 provides, in pertinent part, that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness...." MLRPC Rule 3.7(a). The policy behind this rule is succinctly stated in the Comment: "Combining the roles of advocate and witness can prejudice

---

**4.** Rule 3.7 in its entirety reads:
 (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
 (1) the testimony relates to an uncontested issue;
 (2) the testimony relates to the nature and value of legal services rendered in the case; or
 (3) disqualification of the lawyer would work substantial hardship on the client.
 (b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.
 MLRPC Rule 3.7.

**5.** Rule 1.7 in its entirety reads:
 (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
 (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
 (2) each client consents after consultation.
 (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
 (1) the lawyer reasonably believes the representation will not be adversely affected; and
 (2) the client consents after consultation.
 (c) The consultation required by paragraphs (a) and (b) shall include explanation of the implications of the common representation and any limitations resulting from the lawyer's responsibilities to another, or from the lawyer's own interests, as well as the advantages and risks involved.
 MLRPC Rule 1.7.

the opposing party and can involve a conflict of interest between the lawyer and client." MLRPC Rule 3.7 cmt. With regard to the mixing of roles, the Comment continues:

> The opposing party has proper objection where the combination of roles may prejudice that party's rights in the litigation. A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof.

*Id.*

Commentators have noted that the problem for the opposing party is most acute when the advocate is expected to testify *for* his client. *See, e.g.,* Charles W. Wolfram, *Modern Legal Ethics* § 7.5.2(c), at 380–82 (1986). If the opposing party, as in the present case, desires that the advocate testify *against* his client, the prejudice to the opposing party *may* be less, but that party still has grounds to complain. *See id.* at 383 & n. 78 (citing *Freeman v. Kulicke & Soffa Indus.,* 449 F.Supp. 974, 981 (E.D.Pa.1978), *aff'd,* 591 F.2d 1334 (3d Cir. 1979); *Ross v. Great Atl. & Pac. Tea Co.,* 447 F.Supp. 406, 409 (S.D.N.Y.1978); *Emerald Green Homeowners Ass'n, Inc. v. Aaron,* 90 A.D.2d 628, 456 N.Y.S.2d 219 (1982)).

When an opposing party moves for disqualification of the other party's counsel, the court will take a hard look at such a motion. The concern is that the opposing party will use such a motion to block, harass, or otherwise hinder the other party's case. Such "tactical abuse" of the disqualification process is to be guarded against. *See* ABA, *Annotated Model Rules of Professional Conduct* 359 (3d ed.1996) (annotations to Rule 3.7) (citing *Paramount Communications Inc. v. Donaghy,* 858 F.Supp. 391 (S.D.N.Y.1994); *Kalmanovitz v. G. Heileman Brewing Co.,* 610 F.Supp. 1319 (D.Del.1985); *Devins v. Peitzer,* 622 So.2d 558 (Fla.Dist.Ct.App.1993); *May v. Crofts,* 868 S.W.2d 397 (Tex.Ct.App.1993)).

To that end, as the appellants rightly note, courts closely scrutinize such disqualification motions. Among the factors

courts have adopted when deciding motions for disqualification are the materiality of the advocate-witness's evidence; the exclusivity of the advocate-witness as the source of the evidence; and the prejudice to the advocate-witness's client. *See, e.g., LeaseAmerica Corp. v. Stewart,* 19 Kan.App.2d 740, 876 P.2d 184, 192 (1994); *Smithson v. USF & G Co.,* 186 W.Va. 195, 411 S.E.2d 850, 856 (1991).

There is in the present case, however, an overriding factor: Mehlman's own understanding of the conflict presented by his accepting employment *by* the appellants and of the necessity of his being a witness *against* the appellants. As Mehlman admitted to the court at the hearing called to hear exceptions to the special master's report on the issue of his disqualification:

Clearly, I was relevant and I could not represent Mr. Klupt if the allegation was that the lawyer who arrived at an opinion that said Philmax could enforce its agreement was part of a fraud, obviously I was not part of anything to do with the Defendants. So, if I came to the same conclusion, at least there is some relevance.

... [A]t that point in time with the allegations against Williams and [Connolly], I suppose I probably would be a necessary witness. I am not going to jerk the Court around. I would be a necessary witness in that instance.

Mehlman's admission reflects his understanding of the situation not only at the time of the hearing, but also at the time when his participation in the appellants' case was first solicited. "So, when I first got the call from Mr. Piven, I knew about the Williams and [Connolly] allegation. I said there is a problem because of Williams and [Connolly]."

When the attorney in question is so clearly aware before the fact of the potential conflict between his roles as advocate and witness, then the scrutiny usually applied to an opposing party's motion for disqualification is unnecessary, and the burden shifts to the attorney in question. "[I]f the lawyer knows before the litigation has commenced that his or her testimony might be required, then the burden is on the lawyer

to establish an exception to the Rule if he or she is to avoid disqualification." *Annotated Model Rules of Professional Conduct, supra,* at 359 (citing *Office of Disciplinary Counsel v. Collins,* 71 Ohio St.3d 310, 643 N.E.2d 1082 (1994); *Mentor Lagoons, Inc. v. Teague,* 71 Ohio App.3d 719, 595 N.E.2d 392 (1991)).

 The only possible exception that the appellants might invoke is that "the testimony relates to an uncontested issue." MLRPC Rule 3.7(a)(1). The appellants argue that, because they filed a Third Amended Complaint (TAC) that, they purport, eliminates the claims for which Mehlman would be a necessary defense witness, the necessity of calling Mehlman as a witness has likewise been eliminated. There are clear problems with such an argument. Whether the TAC actually eliminates the necessity of Mehlman testifying is still a question. More importantly, the TAC was not filed until a month after the appellees' motion to disqualify. It was filed by Mehlman himself, although he claims that his predecessor had intended to make the changes embodied in the amended filing. The danger that such a filing could be self-serving is obvious.

The rule in Maryland generally allows the free filing of amended pleadings. Md. Rule 2–341; *Osheroff v. Chestnut Lodge, Inc.,* 62 Md.App. 519, 526, 490 A.2d 720 (citing *Crowe v. Houseworth,* 272 Md. 481, 325 A.2d 592 (1974); *Gensler v. Korb Roofers, Inc.,* 37 Md.App. 538, 378 A.2d 180 (1977); *Staub v. Staub,* 31 Md.App. 478, 356 A.2d 609, *cert. denied,* 278 Md. 735 (1976)), *cert. denied,* 304 Md. 163, 497 A.2d 1163 (1985). Such free amendments as the rule allows must, however, come within the ambit of what justice permits and must not cause prejudice to the opposing side. Md. Rule 2–341(c); *Mattvidi Assocs. Ltd. Partnership v. NationsBank of Va., N.A.,* 100 Md.App. 71, 83, 639 A.2d 228 (quoting *Robertson v. Davis,* 271 Md. 708, 710, 319 A.2d 816 (1974)), *cert. denied,* 336 Md. 277, 647 A.2d 1216 (1994).

Without ruling on the substantial propriety of the TAC, which is not before us, we find that justice does not permit us to consider such an amended complaint as having converted a

contested issue into an uncontested issue for purposes of avoiding the strictures of MLRPC Rule 3.7(a), when the potential advocate-witness in question drafted and filed the complaint himself at a time significantly after his disqualification was requested. Consequently, no valid exception to Rule 3.7 having been found, we uphold the circuit court's finding of a violation of Rule 3.7.

### *MLRPC Rule 1.7*

As noted above, while MLRPC Rule 3.7 concerns in the main the potential prejudice to opposing parties of facing an advocate-witness on the other side, the rule also guards against conflicts of interest between the advocate-witness and his own client. As the Comment to Rule 3.7 makes clear, such a conflict is adjudged by reference to the standard rules on conflicts of interest: "Whether the combination of roles involves an improper conflict of interest with respect to the client is determined by Rule 1.7 or 1.9." MLRPC Rule 3.7 cmt. But the Comment to Rule 3.7 also leaves little doubt about the resolution of one particular type of conflict encountered by the advocate-witness. "[I]f there is likely to be substantial conflict between the testimony of the client and that of the lawyer or a member of the lawyer's firm, the representation is improper." *Id.* Scholarly commentators concur. *See* Wolfram, *supra*, § 7.5.2(c), at 383–84 ("[T]he advocate who testifies adversely is probably subject to professional discipline if the lawyer failed to withdraw from the case when it first became apparent that the lawyer would be required to testify."); *cf.* 1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 3.7:103, at 680 (2d ed. Supp.1996) ("If the lawyer (or a member of his firm) must give testimony that is either adverse or ambivalent with respect to the client's cause, the cause may be damaged.").

Independent analysis under Rule 1.7 leads to the same result. MLRPC Rule 1.7 provides in relevant part that "[a] lawyer shall not represent a client if the representation of that client may be materially limited ... by the lawyer's own interests." MLRPC Rule 1.7(b). A lawyer's interest in testifying truthfully but adversely to his client must inherently

conflict with the client's own interests. The appellants argue that they have, after consultation, waived the conflict and thus have resolved it in accordance with the exception to Rule 1.7(b), which allows such a resolution if "the lawyer reasonably believes the representation will not be adversely affected; and the client consents after consultation." MLRPC Rule 1.7(b)(1)–(2). We are persuaded, however, that such a conflict is not waivable in this case.

There is no suggestion among the comments on Rule 3.7 discussed above that the adverse testimony of an advocate-witness presents a waivable conflict; quite the opposite seems to be the case. The definition of an unwaivable conflict is "one 'which a disinterested lawyer would advise a client not to waive.'" *Fairfax Sav., F.S.B. v. Weinberg & Green,* 112 Md.App. 587, 637, 685 A.2d 1189 (1996) (quoting expert testimony of Prof. Charles Wolfram); *see also* MLRPC Rule 1.7 cmt. ("[W]hen a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent."). We find that under the circumstances presented in this case—namely, the admission of the advocate-witness that he knew of the conflict before accepting employment; the fact that the advocate-witness's testimony would be adverse to his client; the facts that the attorney's involvement in the case prior to the motion for disqualification was minimal and his disqualification was no hardship for the appellants; and the fact that the attorney entered into a contingent fee agreement with the appellants—no disinterested lawyer would advise a client to waive the conflict inherent in the advocate-witness dilemma here presented. Consequently, we affirm the circuit court's finding of a violation of MLRPC Rule 1.7.

### Disqualification Within the Discretion of the Court

■ Having upheld the circuit court's findings of ethical violations, we must now consider the sanction imposed by the court, disqualification of the appellants' counsel. It is agreed that disqualification is an appropriate remedy to advocate-witness conflicts of interest. *See Annotated Model Rules of*

*Professional Conduct, supra,* at 357; Hazard & Hodes, *supra,* § 3.7:103, at 681; Wolfram, *supra,* § 7.5.2(e), at 388–90. The decision to impose disqualification is, as noted above, within the discretion of the court. For all the factors discussed above at length, we find no abuse of discretion in the court's order of disqualification.[6]

## Conclusion

We affirm the trial court's orders of dismissal and disqualification and deny the appellants' appeal on all grounds.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANTS.**

---

**6.** The appellees have raised the question of whether Mehlman's participation in this appeal was appropriate. The court's order of disqualification is not explicit on the question of whether Mehlman was disqualified from representing the appellants at trial or from *any* further participation in this case. We note that generally disqualification under Rule 3.7 extends only to representation at trial. "[N]either the Model Code nor the Model Rules prohibit a lawyer who withdrew [or was disqualified] as counsel of record in anticipation of testifying from assisting substitute counsel or arguing the appeal...." *Annotated Model Rules of Professional Conduct, supra,* at 361 (citing ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1503 (1983)). Consequently, we find no misconduct in Mehlman's participation in this appeal.